IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 15-03837 (ESL) |
| The Horned Dorset Primavera Inc. | CHAPTER 11 |
| Debtor | |
| | ADV. PROC. NO. 16-00141 |
| The Horned Dorset Primavera Inc.<br>Plaintiff/Debtors | |
| vs. | |
| Francisco Domenech Fernandez<br>and Veronica Ferraiuoli Hornedo | |
| Defendants | |

OPINION AND ORDER

This case is before the court upon the *Urgent Motion to Vacate or Modify Restraining Order* filed by Plaintiff, The Horned Dorset Primavera Inc. (the "Horned Dorset" or "Plaintiff") (Docket No. 78). For the reasons stated below, Plaintiff's *Urgent Motion to Vacate or Modify Restraining Order*, which enjoined the Plaintiff from disconnecting the utility services to the Defendant, is denied. However, Plaintiff's request to modify the Order to require bond from the Defendants pursuant to Fed. R. Civ. P. 65(c) is hereby granted.

Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(C). Venue is proper under 28 U.S.C. § 1409.

Procedural Background

On July 7, 2016, the Horned Dorset, filed the instant Adversary Proceeding, which included, as Count I, a request for preliminary and permanent injunction relief against Francisco Domenech Fernandez and Veronica Ferraiuoli Hornedo (the *"Defendants" or "Movants"*) to order them to empty and clean the swimming pool located within the Defendants' property (Docket No. 1).

On July 8, 2016, Plaintiff requested a *Preliminary Injunction,* considering that the unmaintained swimming pool located in the Defendants' property was infested with mosquitos and represented a sanitary hazard to the hotel guests and staff (Docket No. 4). The Plaintiff had been visited by the Puerto Rico Department of Health due to the claims of mosquito hatchery and, as a result, the operations of the hotel were at risk. During the hearing held on July 15, 2016, regarding the preliminary injunction, the parties informed the court that the swimming pool had been cleaned, which mooted the request for a preliminary injunction (Docket No. 13). However, the Plaintiff alerted the court that the swimming pool issue could be a "recurring problem because the villa had no electricity and the pool had no filter motor". The court ordered the parties to file an agreement as to the future maintenance of the pool, to which the Defendants complied (Docket No. 16).

On January 20, 2017, Defendant Veronica Ferraiuoli, appearing *pro se*, filed an *Urgent Motion Requesting Order* (Docket No. 43), stating that further issues with the maintenance of the pool had arisen because the Horned Dorset had disconnected the electrical power directed to Unit No. 10 since year 2015, and proper maintenance to the pool was unattainable without electricity. The Defendant requested the court to order the restitution of electricity to Unit No. 10 in order to maintain the swimming pool algae free, which could be achieved with an electrical pump running. The Defendants were at risk of incurring in contempt with the court as the swimming pool could not be properly maintained without a pump and electrical power. The Defendant further argued that the lack of electricity had impeded them to enjoy their property and had provoke several property maintenance issues. Defendant Ferraiuoli requested the court to determine a suitable

compensation to Plaintiff for the utility consumption of Unit No. 10 and suggested $50.00 a month, as an interim amount while the court made a final determination.

On January 23, 2017, Plaintiff filed a *Motion Informing Debtor in Possession['s] Intent to Oppose Urgent Motion Filed at Docket No. 43,* requesting until January 27, 2017, to state its position as to the Defendant's *Urgent Motion* and otherwise plead. On January 27, 2017, the court scheduled a hearing to consider the Defendant's *Urgent Motion* (Docket No. 47). On January 27, 2017, the Horned Dorset filed its *Opposition to Urgent Motion Requesting Order*, alleging that (1) it had no legal duty to provide utility services to the private property of the Defendants; (2) the electric power and water service accounts are not part of the usufruct, and pertain to the Plaintiff, which opened them over thirty (30) years ago; (3) the Horned Dorset had allowed Defendants to use electricity from Plaintiff's account while the Defendants' property was part of the hotel's room pool and they "contributed" to the payment of the utilities expenses but, when the parties' "joint venture" ended, the Horned Dorset decided to no longer allow the Defendant's to receive utility services from the hotel's account; (4) if the Defendant's "so urgently need or require electricity and water service", the Defendants should request each utility company to open an account under their names; (5) for the court to grant the Defendant's request, the court must first make a determination that the Horned Dorset has the legal obligation to provide the utility services under its utilities accounts, obligation that does not originate from the *Deed of Usufruct* or the *Deed of Restrictive Covenants;* and (6) if, *arguendo,* the Plaintiff had an obligation to provide utility services to Defendant, the amount of $50.00 is unreasonable as a commercial rate applies to the utility accounts, and expert testimony is required to make said determination. The Plaintiff further argued that Defendant's requests constituted a misuse of the urgent motion mechanism, as they have been without electricity for over a year. (Docket No. 50).

During the hearing held on June 9, 2017, the parties informed the court that they were attempting to solve the matters addressed at Dockets Nos. 43 and 50, and the court granted the parties a term of fourteen (14) days to file a settlement agreement or otherwise move the court. (Docket No. 68). On July 7, 2017, the Plaintiff filed a *Motion to Inform Status of Settlement*

*Negotiations* (Docket No. 69) stating that no agreement had been reached between the parties, that the Horned Dorset had no obligation to provide utility services and, further, that it was legally impeded to provide the utility services to the Defendants, pursuant to Article A of Section X of Regulation No. 7982 of the Puerto Rico Electric Power Authority ("PREPA") and Article 2.08 of the Puerto Rico Aqueduct and Sewer Authority ("PRASA") Regulation No. 8901 (Docket No. 69). On July 14, 2017, the court ordered Defendants to state their position as to Plaintiff's *Motion to Inform Status of Settlement Negotiations* within fourteen (14) days (Docket No. 70). On July 27, 2017, the Defendants requested an extension of time of twenty (20) days to comply with the court's order (Docket No. 72), which was granted at Docket No. 73.

On August 7, 2017, the Defendants filed an *Urgent Motion Requesting Order Preserving Status Quo and Response to "Motion to Inform Status of Settlement Negotiation"* (Docket No. 75)*.* Defendants stated that, pursuant to an agreement reached amongst the parties on June 9, 2017, the Plaintiff restored electricity to Defendants' property on June 28, 2017. However, on August 3, 2017, the Plaintiff disconnected the electrical power, without warning or notification. Defendants sustained that: (1) electricity is necessary to keep the swimming pool clean and sanitary; (2) they had agreed to pay for the power consumed; (3) certain electric equipment in the property was damaged as a result of Plaintiff's determination to cut power off; (4) the Plaintiff is not the owner of the electricity and water meter of the Residence at the Horned Dorset Primavera Complex ("the Complex") nor the power or water distribution system, and has no right to "appropriate for itself the Complex's only electricity or water meter and decide who in the Complex can and cannot have electrical power or water" (Docket No. 75, p. 3); (5) Plaintiff's representation that an agreement had not been reached as to the Defendants' consumption of electricity was false, considering that the parties had agreed that the consumption of Villa 10 could be measured by a meter to be installed in the breaker box, and paid accordingly; (5) the electrical distribution system from which the Plaintiff is excluding the Defendants, belongs to the owners of the Residences at the Horned Dorset Primavera as a common element; and (6) the totality of the Complex shares a single electricity and water meter. None of the documents or

-4-

deeds grant Plaintiff the right to control the utilities in the Complex and Plaintiff voluntarily chose to place the utility accounts in its name because it had control of all the Complex at one point.

On August 7, 2017, the Court granted Defendants' *Urgent Motion* and ordered Plaintiff to return electricity to Villa 10, and enjoined it from disconnecting electrical power and/or utilities without authorization from the court. Furthermore, a hearing was scheduled for December 12, 2017 (Docket No. 76).

On August 21, 2017, the Plaintiff filed its *Urgent Motion to Vacate or Modify Restraining Order* (Docket No. 78). The Plaintiff argues that the motion was granted only fifty-five (55) minutes after it was filed and that the Horned Dorset did not have a reasonable opportunity to be heard or to defend itself. Additionally, the Plaintiff argues that the Defendants failed the four prong test required in our jurisdiction, in relation to preliminary injunctive relief, stating that Defendants "(1) did not exhibit any likelihood to succeed in the merits of their case; (2) the Defendants did not plead and evidenced any irreparable injury as defined by case law; and (3) no assertion was made as to how Defendant's injury outweighs the harms the injunctive relief will cause the Debtor." The irreparable harm alleged by Defendant, namely, the interruption of the use and enjoyment of their property, and the risk of losing the "multi-thousand-dollar investment made in the past months replacing the equipment in Villa 10 that was damaged as a result of the Debtor's illegal determination to cut off power to the property" are "hyper speculative, self-serving, and unfounded" and do not constitute sufficient harm to warrant injunctive relief. Furthermore, the Plaintiff states that the Defendants have other remedies in law pursuant to state law regulations. The Horned Dorset further alleges that the court should have requested the Defendants a bond, pursuant to Fed. R. Civ. Proc. 65(c) as "the long wait [for a hearing] heavily burdens the Debtor as utility consumption encumbers Debtor's post-petition income, and the Debtor has no security that it will be able to recoup the damages the TRO is currently causing."

On December 12, 2017, a hearing was held, to consider the contested matters pending on the record (Docket No. 88). The parties argued their positions as to the current apportionment of the utilities' cost amongst the hotel and the individual properties. During the hearing, the court

acknowledged that it cannot undo the way the construction of the Complex took place, thus the court needs to deal with the construction, as it is. The court also noted that the parties entered into their contracts and relationships with knowledge of these factors.

Although the court concluded that the matters required a trial hearing, Plaintiff's *Motion for Reconsideration of Order Granting Summary Judgment as [Un]opposed* (Docket No. 58) wa*s* pending at the that time, and required a revision of the court's Order at Docket No. 42, granting the Defendants *Motion for Summary Judgment*; and Partial Judgment at Docket No. 46, dismissing Counts, III, IV, and V of the Complaint. Considering that the issues related to the utility apportionment and the connection of utility services were related to the proof of claim no. 10 and Count V of the Complaint, the court explained that Plaintiff's *Reconsideration*, and the merits of Defendants' *Motion for Summary Judgment* were to be entertained, in order determine if a trial hearing was required. Nonetheless, the Plaintiff's *Urgent Motion to Vacate or Modify Restraining Order* (Docket No. 75) remained unaddressed.

On May 4, 2018, the court entered an *Order*, stating that: (1) crucial elements of fact are missing in the record, thus preventing the court to enter judgment in regards to the legal relationship and obligations of the parties pursuant to the Deed of Usufruct, the Deed of Restrictive Covenants, or as agreed by the parties based on a verbal property management agreement; (2) the court remains blind as to the itemization, legal source and amounts allegedly apportioned and imposed by the Horned Dorset to the Defendants, which are key to determine the adequacy or inadequacy of proof of claim no. 10. Therefore, the court vacated the Order at Docket No. 42 and the Partial Judgment entered at Docket No. 46. The court ordered the Defendants to answer the Complaint within twenty-one (21) days. (Docket No. 90).

In view of the above course of events, the court must address Plaintiff's *Urgent Motion to Vacate or Modify Restraining Order* (Docket No. 75), which relates to the Defendants' *Urgent Motion Requesting Order Preserving Status Quo and "Response to Motion to Inform Status of Settlement Negotiation"* (Docket No. 75); and the court's *Order* enjoining the Plaintiff from disconnecting electrical power and/or utilities, without authorization of the court (Docket No. 76).

The Plaintiff requests the court to vacate the injunctive relief granted to the Defendants. However, if the court determines that injunctive relief is warranted, the Plaintiff requests the court to modify the Order, requesting the payment of a security by the Defendants, pursuant to Fed. R. Civ. P. 65(c).

## *Undisputed Facts*

The court finds that the following facts, as reflected in the record, are undisputed: (1) there is only one meter for the water and another meter for electricity utility services in the Complex, which includes the Plaintiff as usufructuary, and the individual property owners, as that was they way the Complex was designed and built; (2) the Plaintiff is the owner of the accounts associated to the meters for each utility; (3) at the present time, the Horned Dorset formula for allocating utilities cost apportions 50% of the consumption of water and electricity to the operation of the hotel and 50% to the individual villas, and obtains reimbursement from most of the villas through a property management agreement; (4) the Defendants' villa is not part of the hotel room pool and has no property management agreement with the Plaintiff (Docket 43, p.5); (5) the Horned Dorset does not provide utilities to the villas that are not part of the room pool; and (6) a meter was installed in the breaker box of Defendants' property, which allows the parties to measure the exact electricity power service consumption of the Villa. However, because of the way the Complex was constructed, the parties are not able to measure the water consumption of the individual properties. The court notes that the utility services issue is related to the objection to proof of claim no. 10 issue, which is part of the Complaint, as the apportionment made by the Plaintiff has been questioned by the Defendants in their proof of claim 10.[1]

## *Reconsideration Standard*

"Motions to reconsider are not recognized by the Federal Rules of Civil Procedure or the Federal Rules of Bankruptcy Procedure *in haec verba*." In re Lozada Rivera, 470 B.R. 109, 112

---

[1] The Court notes that on May 28, 2015 Puerto Rico Aqueduct and Sewer Authority (PRASA) filed amended proof of claim #1-2 in the amount of $77,423.25 for water and sewer services. Further, on May 29, 2015, the Puerto Rico Power Authority filed proof of claim #2-1 in the amount of $331,775.50 for electric power. These claims have not been objected by the Debtor.

-7-

(Bankr. D.P.R. 2012), *citing* Jimenez v. Rodriguez (In re Rodriguez), 233 B.R. 212, 218-219 (Bankr. D.P.R. 1999), conf'd 17 Fed. Appx. 5 (1st Cir. 2001). Also see Van Skiver v. United States, 952 F.2d 1241, 1243 (10th Cir. 1991); Lavespere v. Niagara Mach. & Tool Works Inc., 910 F.2d 167, 173 (5th Cir. 1990), cert. denied 510 U.S. 859, abrogated on other grounds by Little v. Liquid Air Corp., 37 F.3d 1069, 1075-1076 (5th Cir. 1994). Rather, federal courts have considered motions so denominated as either a motion to "alter or amend" under Fed. R. Civ. P. 59(e) or a motion for relief from judgment under Fed. R. Civ. P. 60(b). See Fisher v. Kadant, Inc., 589 F.3d 505, 512 (1st Cir. 2009) (noting a motion for reconsideration implicated either Fed. R. Civ. P. 59(e) or 60(b)); Equity Security Holders' Committee v. Wedgestone Financial (In re Wedgestone Financial), 152 B.R. 786, 788 (D. Mass. 1993). "These two rules are distinct; they serve different purposes and produce different consequences. Which rule applies depends essentially on the time a motion is served. If a motion is served within fourteen days of the rendition of judgment, the motion ordinarily will fall under Rule 59(e). If the motion is served after that time, it falls under Rule 60(b)." In re Lozada Rivera, 470 B.R. at 113, quoting Van Skiver, 952 F.2d at 1243. Also see Universal Ins. Co. v. DOJ, 866 F. Supp. 2d 49, 73 (D.P.R. 2012) ("A motion is characterized pursuant to [Fed. R. Civ. P.] 59(e) or [Fed. R. Civ. P.] 60(b) based upon its filing date.") "The substance of the motion, not the nomenclature used or labels placed on motions, is controlling." In re Lozada Rivera, 470 B.R. at 113.

In the instant case, the Plaintiff's *Urgent Motion to Vacate or Modify Restraining Order* was filed within fourteen (14) days of the entry of *Order*. Therefore, it will be considered under Fed. R. Civ. P. 59(e), applicable to bankruptcy proceedings through Fed. R. Bankr. P. 9023.

Fed. R. Civ. P. 59(e) itself does not state the grounds on which relief under the rule may be granted. Therefore, trial courts have considerable discretion in deciding whether to grant or deny a motion to alter or amend under Fed. R. Civ. P. 59(e). See ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 55 (1st Cir. 2008) ("[Trial] courts enjoy considerable discretion in deciding [Fed. R. Civ. P.] 59(e) motions, subject to circumstances developed in the case law."); Venegas-Hernández v. Sonolux Records, 370 F.3d 183, 190 (1st Cir. 2004), citing Edward H. Bohlin Co.

v. Banning Co., 6 F.3d 350, 355 (5th Cir. 1993); Robinson v. Watts Detective Agency, 685 F.2d 729, 743 (1st Cir. 1982).

"The granting of a motion for reconsideration is an extraordinary remedy which should be used sparingly." United States ex rel. Ge v. Takeda Pharm. Co., 737 F.3d 116, 127 (1st Cir. 2013), Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006). "In practice, because of the narrow purposes for which they are intended, [Fed. R. Civ. P. 59(e)] motions typically are denied." Wright & Miller 11 Federal Practice and Procedure § 2810.1 (2nd ed. 2012) at p. 171. "[M]otions for reconsideration should not give parties a 'second bite at the apple' or 'another roll of the dice'". Conway v. A.I. duPont Hosp. for Children, 2009 U.S. Dist. LEXIS 45198 at *13, 2009 WL 1492178 at *4 (E.D. Pa. 2009). Also see BBVA v. Santiago-Vazquez (In re Santiago-Vazquez), 471 B.R. 752, 761 (B.A.P. 1st Cir. 2012) ("in denying reconsideration, the bankruptcy court correctly applied the First Circuit precedent against a second bite at the apple: litigants may not use Fed. R. Civ. P. 59(e) to advance arguments they could have made earlier").

Generally, in order for a motion for reconsideration to proceed under Fed. R. Civ. P. 59(e), the movant must clearly establish a manifest error of law or fact or present newly discovered evidence that could not have been diligently found during the case. See Schwartz v. Schwartz (In re Schwartz), 409 B.R. 240, 250 (B.A.P. 1st Cir. 2008), *citing* In re Rodriguez, 233 B.R. at 219, BBVA v. Vazquez (In re Vasquez), 471 B.R. 752, 760 (B.A.P. 1st Cir. 2012), Aybar v. Crispin-Reyes, 118 F.3d 10, 16 (1st Cir. 1997). "To meet the threshold requirements of a successful [Fed. R. Civ. P.] 59(e) motion, the motion must demonstrate the reason why the court should reconsider its prior decision and must set forth facts or law of a strongly convincing nature to induce the court to reverse its earlier decision." In re Schwartz, 409 B.R. at 250 (citations omitted).

Rule 59(e) motions are "aimed at *re*consideration, not initial consideration". Federal Deposit Ins. Corp. v. World University, Inc., 978 F.2d 10, 16 (1st Cir. 1992). "A motion for reconsideration 'does not provide a vehicle for a party to undo its own procedural failures and it certainly does not allow a party to introduce new evidence or advance arguments that could or should have been presented to the district prior to the judgment." Marks 3-Zet-Ernst Marks

-9-

GmBh & Co. KG v. Presstek, Inc., 455 F.3d 7, 15-16 (1st Cir. 2006) (citations omitted).  Thus, a motion for reconsideration cannot be used as a vehicle to re-litigate matters already litigated and decided by the court.  See Standard Química de Venezuela v. Central Hispano International, Inc., 189 F.R.D. 202, 205 fn.4 (D.P.R. 1999).  "A party cannot use a Rule 59(e) motion to rehash arguments previously rejected or to raise ones that 'could, and should, have been made before judgment issued."  See Soto-Padró v. Public Buildings Authority, 675 F.3d 1, 9 (1st Cir. 2012) (citations omitted).  Conversely, the court should renew and reconsider whether it "patently misunderstood a party … or has made an error not of reasoning but apprehension."  Ruiz Rivera v. Pfizer Pharmaceuticals, LLC, 521 F.3d 76, 82 (1st Cir. 2008).  "A manifest error of law under Rule 59(e) is the "wholesale disregard, misapplication, or failure to recognize controlling precedent." AM Gen. LLC v. Demmer Corp., 2015 U.S. Dist. LEXIS 33333, *9-10, 2015 WL 1256370 citing Oto v. Metro Life Ins. Co., 224 F.3d 601, 606 (7th Cir. 2000).

On August 7, 2017, in response to Defendant's urgent request at Docket No. 75, the Court ordered the Plaintiff to return electricity to Villa 10, and enjoined it from disconnecting electrical power and/or utilities without the authorization of the court (Docket No. 76). On August 21, 2017, the Plaintiff requests the Court to vacate or modify the Order at docket no. 76, pursuant to Fed. R. Civ. P. 59 (e), alleging that the court granted the remedy to the Movants "just 55 minutes after it was filed" and that it was deprived from a reasonable opportunity to be heard and defend itself. Plaintiff additionally alleges that reconsideration is warranted as the Movants had failed to comply with the legal standard for injunctive relief. Further, the Horned Dorset argues that the restraining order was issued "without any sort of security in favor of the Debtor" pursuant to Fed. R. Civ. P. 65(c). The court will, therefore, discuss the legal standard for the preliminary injunction relief and the requirement of a bond, pursuant to Fed. R. Civ. P. 65(c).

*Preliminary Injunction Standard*

The Defendants requested preliminary injunctive relief from the court, arguing that the determination of the Plaintiff to disconnect the electricity service impeded the proper maintenance of the pool, which was initially demanded by the Plaintiff through these proceedings. Additionally, the Defendants alleged that the disconnection of the utility services interfered with the enjoyment of their property. Defendants, therefore, requested the court to order the Plaintiff to reconnect the electricity service, and to enjoin it from disconnecting the utilities during the pendency of the case.

The Court of Appeal for the First Circuit has crafted a four-part framework in order to determine whether to grant or deny preliminary injunctive relief. Under this formulation, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the non-movant if enjoined as contrasted with the hardship to the movant if no injunction is issued; and (4) the effect (if any) of the court's ruling on the public interest. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Circuit 1996); Weaver v. Henderson, 984 F.2d 11, 12 & n.3 (1st Cir. 1993); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991). "Application of these standards to a particular set of facts is not a mechanical process." Nat. Tank Truck Carriers, Inc. v. Burke, 608 F.2d 819, 823 (1st Cir. 1979).

The sine qua non of that formulation is whether the movants are likely to succeed on the merits. Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981). Likelihood of success is the main bearing wall of the four-factor framework. Ross-Simons, 102 F.3d at 16, citing Weaver v. Herderson, 984 F.2d 11, 12 (1st Circuit 1993); Auburn News Co. 659 F.2d at 277. The trial court, at the preliminary injunction stage, need not predict the eventual outcome on the merits with absolute assurance. *Id.* A court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes. Narragansett Indian Tribe, 934 F.2d at 6, citing Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 238 (1st Cir. 1986) (en banc), cert. denied, 481 U.S. 1014 (1987) and Planned

Parenthood League v. Bellotti, 641 F.2d 1006, 1009 (1st Circuit 1981). Thus, a party losing the battle on likelihood of success may nonetheless win the war at a succeeding trial on the merits. *Id*. Preliminary injunction rulings are premised on a tentative development of the facts, which will be fleshed out as trial approaches. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 223 (1st Circuit 2003), referencing Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 678 (1st Cir. 1998) and Cohen v. Brown Univ., 991 F.2d 888, 902 (1st Cir. 1993).

"The irreparability of the injury is of paramount concern." K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Circuit 1989), referencing Weinberger v. Romero-Barceló, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity "is essential in order effectually to protect property rights against injuries otherwise irremediable."). "The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies. The two are flip sides of the same coin: if money damages will fully alleviate harm, then the harm cannot be said to be irreparable." *Id.* The injunction-seeker must show that he is subject to continuing irreparable injury for which there is no adequate remedy at law. Lopez v. Garriga, 917 F.2d 63, 68 (1st Cir. 1990). "If the movant suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel. Thus, a cognizable threat of such harm can support a restraining order." Ross-Simmons, 102 F.3d at 19. A movants showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm. *Id.* "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004), citing Ross-Simons, 102 F.3d at 18.

An attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem. Ross-Simmons, 102 F.3d at 19. "In weighing a request for injunctive relief, courts have adopted a "sliding scale" approach; the greater the harm the less emphasis need be placed on the likelihood of success on the merits." In re Aerovox, Inc., 281 B.R. 419, 433 (2002).

An injunction issues only where the intervention of a court of equity is essential in order to protect property rights against injuries otherwise irremediable. Weinberger, 456 U.S. at 321 (1982), citing Cavanaugh v. Looney, 248 U.S. 453, 456 (1919). A court must balance the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. *Id*.

"…[A] a preliminary injunction –as indicated by the numerous more or less synonymous adjectives used to label it- is, by its very nature interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its as-for-the-time - beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began." Sanchez v. Esso Std. Oil Co., 572 F.3d 1, 34 (1st Cir. 2009), citing Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1952). Therefore, a court cannot prejudge the merits of a case at the preliminary injunction stage, and should limit its fact findings to those necessary to determine if the injunction should be issued. Sanchez, 572 F.3d at 35-36. "At preliminary stage, it is both the trial court's prerogative and its duty "to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." Ross-Simmons, 102 F. d at 17, citing Independent Oil Chem. Workers of Quincy v. Procter & Gamble Mfg. Co., 864 F.2d 927, 933 (1st Cir. 1988).

Evidentiary hearings are desirable at the preliminary injunction stage, however, flexibility is the watchword. Rosario-Urdaz, 350 F.3d at 223. When pondering not to convene an evidentiary hearing, the trial court must consider competing submissions of evidentiary quality, if the facts are essentially undisputed, or if the answer to the likelihood-of-success inquiry is readily apparent *Id*. Although a hearing is often held prior to entry of a preliminary injunction, a hearing is not an indispensable requirement. Aoude v. Mobil Oil Corp., 862 F.2d 890, 893 (1st Cir.1988).

Plaintiff argues that the Defendants did not complied with the standards set forth by the Court of Appeals for the First Circuit, stating that: (1) the Defendants did not exhibit any likelihood to succeed on the merits; (2) the Defendants failed to plead or evidence any irreparable

injury as defined by case law and that (3) in the balance of relevant impositions, the Defendants failed to assert how their injury outweighed the harms that the injunctive relief may cause to the Debtor. The court will examine each prong individually, as contended by the parties in written and oral argument.

### *Defendants' Likelihood of Success on the Merits*

The Defendants proffered that they are dependent on the exclusive discretion of the Horned Dorset, as to whom is "served" from the exclusive meters that provide utilities to the Complex. After an evaluation of the record, the court found that the Defendants' likelihood to succeed, in relation to their right to enjoy their property and to provide adequate maintenance to the swimming pool, was apparent. Therefore, on August 7, 2016, the court ordered the Debtor to refrain from disconnecting the utilities to the Defendants without previous authorization of the court. The requirement to provide adequate maintenance to the swimming pool was demanded by the Horned Dorset through the temporary injunction mechanism (See Docket No. 4). Although the matters leading to the request of injunctive relief turned moot, the Defendants expressed their compromise to maintain the swimming pool clean (Docket No. 16), albeit Plaintiff's expressions of concern stating that the "villa had no electricity and the pool had no filter motor". When the court issued the *Order* on August 7, 2017, the court accepted, as a reasonable inference, that the pump was necessary to keep the swimming pool clean.

During the hearing held on December 12, 2017, the parties confirmed to the court that the Horned Dorset has exclusive control of the utility services on the Complex. The court is persuaded by Defendants' arguments claiming that the Horned Dorset should not gauge which residents can or cannot benefit from the utility services, conditioned upon whether the villa owner have executed the property management agreement or provided the alleged $450.00 monthly electricity fee, which the Horned Dorset established arbitrarily (Docket 43, p. 2). Utility services are not only essential for the proper maintenance of the swimming pool but, most importantly, for the basic enjoyment of the property.

The Horned Dorset alleges that the court's *Order* (Docket No. 76) issued on August 7, 2017, which enjoins the Plaintiff from disconnecting the utilities to the Defendants without authorization of the court, is against PREPA's Regulation No. 7982 (Regulation of Terms and General Conditions to Supply Power[2]), in particular, Article A of Section X of said Regulation. The Horned Dorset alleges that, "… each subscriber must have its own account and receive electric service through its individual account. Since the Defendant's property is not within the Hotel's room pool, nor is their property part of the Hotel's commercial operation, the Hotel is legally unable to provide electric service to any other party" (Docket No. 69, ¶ 2).

The court notes that Article B included in Section IX: Use of Power by the Client, states that: "[t]he client is responsible for the use of power from the delivery point onwards and may not use that energy/power for any other purpose or place that is not specified in the contract or in its service order, in the Use of Permit or Construction, or in its service order at the applicable rate or in this Regulations."[3] Article F(1)- (6) titled Prohibition of the Resale of Power, provides the following:

(1) The resale of power that has been agreed to or contracted with the Authority to another client or to a person is prohibited by the Authority.

(2) The sale and collection of power supplied by the Authority to those clients that are connected to its power grid, may only be effectuated out by the Authority. For this purpose, the Authority installs the appropriate measurement instrumentation in one point of the power service line.

(3) In the cases that the Authority detects that there is a resale of power, it is the responsibility of the client to correct that condition during a term of thirty (30) days from the notification of the same.

(4) If the condition is not corrected in the established time, the Authority may suspend that client's power service.

(5) The resale condition may be corrected by installing separate measurement instrumentation and that the third party contracts the power service with the Authority

---

[2] In the Spanish language the Regulation 7982 is titled, "Reglamento de Términos y Condiciones Generales Para el Suministro de Energía Eléctrica."

[3] Article B of Section IX states the following in the Spanish language: "El cliente es responsible por el uso de la energía eléctrica desde el punto de entrega en adelante y nu puede utilizer dicha  energía para ningún otro propósito o lugar que no esté especificado en el contrato o en su orden de servicio, en el Permiso de Uso ode Construcción, en la tarifa applicable o en este Reglamento."

at the applicable rate and comply with the established requirements so that the service requested may be provided.

(6) The Authority will effectuate an adjustment in the client's invoice for the time in which the resale was being carried out at the applicable commercial rate."[4]

Section X is titled, services through a single meter. Article A, General Disposition, states:

"Except for what is provided in the Regulations for Power Service Rates and in Article B of this Section, the Authority requires that all natural or juridical persons, family and commercial or industrial entity, that uses the power utility service, to contract the same in an individual manner and that for each service install a meter that measures and registers the power utility consumption and the maximum demand, that corresponds to the invoice period." [5]

Article B(1)- (2) of Section X, is titled, Service through a single meter under a wholesale rate, and provides in pertinent part:

"1. In marinas, office buildings or spaces for lease and in hospitals and hotels whereby one or various spaces are leased to concessionaires for complementary services or related to the principal activity, service may be provided to the entire structure though the same meter, master metering, under a wholesale rate. The client, developer or planner must submit an application to the Authority and the same will approve this system when it determines that the measurement using the same meter exceeds the benefits of an

---

[4] Article F(1)-(6) of Section IX states the following in the Spanish language:

"1. Está prohibida la reventa de la energía eléctrica convenida o contratada con la Autoridad por un cliente a cualquier otro cliente o persona.

2. La venta y cobro de la energía eléctrica suministrada por la Autoridad para aquellos clients conectados al sistema eléctrico de ésta, solo puede efectuarse por la Autoridad. Para este propósito, la Autoridad instala instrumentos de medición apropiados en un solo punto de la línea de servicio de energía eléctrica.

3. En los casos en que la Autoridad detecte que existe reventa de energía es responsabilidad del cliente corregir la condición en un término de treinta (30) días a partir de la notificación de la misma.

4. Si la condición no se corrige en el tiempo establecido, la Autoridad puede suspender el servicio de electricidad al cliente.

5. La condición de reventa puede corregirse mediante la instalación de medición separada y que el tercero contrate el servicio con la Autoridad en la tarifa applicable y cumpla con los requisitos establecidos para que se provea el servicio solicitado.

6. La Autoridad realiza un ajuste en la factura al cliente por el tiempo en que realize la reventa a la tarifa commercial que aplique."

[5] Article A of Section X states the following in the Spanish language: "Excepto lo dispuesto en el Reglamento Tarifas para el Servicio de Electricidad y en el Artículo B de esta Sección, la Autoridad requiere que toda persona natural o jurídica, familia y entidad comerical o industrial, usuaria del servicio de energía eléctrica, contrate el mismo de forma individual y para cada servicio instala un contador o medidor (meter) que mide y registra el consume de energía y la demanda máxima, según corresponda, para el período de facturación."

individual measurement, or that the individual measurement is not practical. The client is responsible for the total payment of the invoice rendered by the Authority. The client may utilize a reimbursement mechanism agreed to in writing with the concessionaire or tenant, that is based on, but does not exceed the cost by kilowatt hour (kWh) that results from dividing the invoice total by the total number of kilowatt hours (kWh) utilized.

2. The client is responsible for installing auxiliary meters or sub-meters to measure the consumption that corresponds to each concessionaire or tenant, subject to the terms and conditions included herein in subsection 3 of this Section. The client is responsible for the total payment of the invoice sent by the Authority, independently of whether or not it gets reimbursed from the concessionaires or tenants the amounts that correspond to the utility service cost used by them. The lack of payment of the total or partial invoice submitted by the Authority to the client is sufficient cause to suspend the power service in conformity with that established in Section XIV of this Regulation and in that case the Authority is not responsible for the damages that the client may suffer or the damages that its concessionaires or tenants may suffer from the suspension."[6]  Regulation Num. 7982.

After a thorough review of PREPA's Regulation No. 7982, particularly the above cited provisions,  this court must conclude that if the Horned Dorset has the authority to provide utilities to the other villas in the room pool that constitute the Complex because there is only one meter (master meter) and charge a fee for the same, it is because such terms are specified in the contract or in its service order with PREPA, or included in the Use of Permit or Construction, or in its service order at the applicable rate or in the referenced regulation. However, the Horned Dorset fails to explain how the cited regulation allows the allocation of electric service through the single

---

[6] Article B(1)-(2) of Section X states the following in the Spanish language:

"1. En marinas, edificios de oficinas o locales para alquiler y en hospitales y hoteles donde se arriendan uno o varios locales o concesionarios para servicios complementarios o relacionados con la actividad principal, puede proveerse servicio a toda la estructura a través de un mismo contador o medidor (metro), master metering, bajo una tarifa al por mayor. Por solicitud del cliente o desarrollador o proyectista, la Autoridad aprobará este sistema cuando determine que la medición a través de un mismo contador o medidor (metro), excede los beneficios de la medición individual, o que la medición individual no es práctica. El cliente es responsable por el pago a la Autoridad del total de la facture sometida. El cliente puede utilizer un método de recobro acordado por escrito con el concesionario o arrendatario, que esté basado en, pero no exceda el costo por kilovatio-hora (kWh) que resulte al dividir el importe de la factura entre el total de kilovatios-horas (kWh) utilizados.

2. El cliente es responsable de instalar medidores auxiliares o submetros para medir el consumo que corresponde a cada concesionario o arrendatario, sujeto a los términos y condiciones que más adelante se disponen en el inciso 3 de esta Sección. El cliente es reponsable por el pago total de la factura enviada por la Autoridad, independientemente de que recobre o no de sus concesionarios o arrendatarios las cantidades que correspondan al costo del servicio utilizados por éstos. La falta de pago de la totalidad o parte de la factura sometida por la Autoridad al cliente es causa suficiente para que ésta suspenda el servicio de energía eléctrica, en conformidad con lo dispuesto en la Sección XIV de este Reglamento y en tal caso la Autoridad no es responsable por los daños que pueda sufrir el cliente o sus concesionarios o arrendatarios por tal suspensión."

meter, by differentiating the privately owned villas with property management agreements from those with no contractual relationship with the Horned Dorset. Therefore, the Horned Dorset's argument stating that Article A of Section X of PREPA's Regulation No. 7982 prohibits the Movant's requests to provide electricity services does not pass muster because it is currently providing utility services to the other property owners in the Complex through a master meter.

The court further concludes that even if Article B of Section X were applicable and that all the villa owners in the Complex were considered concessionaries or tenants of the Horned Dorset, and as such each villa would have its own separate auxiliary meter or sub meter to measure power consumption, the applicable formula for reimbursement would have to be based on and not to exceed the cost of kilowatt hour (kWh) that results from dividing the total invoice by total kilowatt hours in contravention with Article F of Section IX and Article B of Section X. Thus, the Horned Dorset's formula that apportions 50% of the consumption of water and electricity to the operation of the hotel and 50% to the individual villas is not based on PREPA's Regulations, but on its arbitrary decision.

The Horned Dorset further alleges that the court's Order (Docket No. 76) was against PRASA Regulation Num. 8901, in particular Article 2.08. The Horned Dorset alleges that Regulation 8901, "… does not allow for the Hotel more than one subscriber per meter on commercial accounts such as the Horned Dorset" (Docket No. 69, ¶ 3). Chapter II of Regulation Num. 8901 is titled, Conditions for Service. Article 2.08 is titled, Multiple Services, and provides the following:

"One may invoice the services for water or sanitary sewage or both to four or more equivalent units that are measured with one meter, with previous authorization from the Authority. The base charge for each unit serviced and the corresponding charges for consumption will be invoiced, in conformity with the effective structured rate, similar to having individual meters. This will only be applicable to equivalent units for residential use and consisting of one structure." [7] The court notes that "equivalent units" is a defined term which means a, "[c]oncept

---

[7] Chapter II, Article 2.08 of Regulation Num. 8901 states in the Spanish language:

-18-

that is utilized to determine the impact to the aqueduct and sanitary sewer systems or both based on the average daily consumption in comparison to one household unit" which is defined pursuant to Regulation Num. 2212, as amended and Regulation Num. 3149 (Regulation 8901, Chapter I, Article 1.05(67))[8]. The court finds that Article 2.08 is applicable where one water meter is used for four (4) or more residential units.

Article 2.09 titled, Combined Service, provides: "[i]n certain cases, the Authority may provide the services for water or sanitary sewage or both for two or more uses (residential and commercial) with only one meter. The Authority will classify this service using the non-residential rate."[9] The court notes that Chapter IV of Regulation 8901, is titled, Norms to Measure and Invoice the Aqueduct and Sanitary Sewer Service or Both to Condominiums and Multiunit Projects. Articles 4.01 defines the requirements for consumption and invoicing under this method. Article 4.02 provides the three (3) different alternatives under this method to measure and invoice. Article 4.03 establishes the applicable rates to real property that is governed by the Condominiums Act of Puerto Rico. Moreover, Chapter 5 of Regulation 8901, titled, Specifications for Meters and Flow Meters, establishes in Article 5.02, the location of meters. Again, the Plaintiff fails to illustrate the court how the current formula for the allocation of the costs for water and sewer services complies with PRASA's regulation.

A review of the regulations leads the court to conclude that if the Horned Dorset has no authority to provide utilities to Defendants, it has no authority to provide utilities to any of the

---

"Se puede facturar los servicios de agua o de alcantarillado sanitario o de ambos a cuatro o más unidades equivalents medido con un solo contador, previa autorización de la Autoridad. Se facturará el cargo base por cada unidad servida y los cargos correspondientes por consumo, de acuerdo a la estructura tarifaria vigente, similar como si estuviera contadores individuales. Esto aplicará solamente a unidades equivalentes de uso residencial de una sola estructura."

[8] Chapter I, Article 1.05(67) of Regulation Num. 8901 states in the Spanish language:
"67. Unidad Equivalente- Concepto que se utiliza para determinar el impacto a los sistemas de acueducto y alcantarillado sanitario o de ambos basado en el consumo promedio diario en comparación a una unidad de vivienda, esto según definido en el Reglamento de Imposición de Cobro por el Derecho a Conectarse a los Sistemas de Acueductos y Alcantarillados de la Autoridad, Reglamento Núm. 2212 de 30 de diciembre de 1976, según enmendado y al Reglamento de Normas de Diseño de la Autoridad, Reglamento Núm. 3149 de 13 de septiembre de 1984, o los reglamentos asociados que se promulguen en el futuro."

[9] Chapter II, Article 2.08 of Regulation Num. 8901 states in the Spanish language:
"En ciertos casos, la Autoridad puede brindar el servicio de acueducto o de alcantarillado sanitario o de ambos para dos o más usos (residencial y commercial) con un sólo contador o medidor de flujo. A los efectos de la aplicación de la tarifa, la Autoridad clasificará dicho servicio como uno de uso no residencial."

property owners in the Complex, although it is currently doing so, controlling which villas receive water and power. Section X, Article B, of the PREPA regulation refers to hotel activities and the provision of electricity services to "concessionaries" and "tenants", which is not the current situation of the Horned Dorset. The Plaintiff is using privately owned residences for its room pool, pursuant to property management agreements, and the referred regulation does not avail the "selection" made by the Horned Dorset to provide utilities exclusively to the residents keeping their properties in the room pool, and excluding any property owners who select not to participate. As stated by the court during the hearing held on December 12, 2017, the court cannot undo how this construction was designed. All the parties involved had, or must have had, knowledge of the "situation" regarding the utility services, notwithstanding, agreed to enter into their respective relationships. The court finds that the Defendants have shown that it is more likely to establish that the Horned Dorset cannot hold exclusive control of the utilities, in order to determine who can and cannot be served from the utilities of the Complex. Therefore, the court concludes that the Defendants have shown likelihood to succeed on the merits, in relation to their right to obtain utility services through the only two (2) utility meters available for the entire Complex.

### *Irreparable harm*

During the hearing held on December 12, 2017, the Defendants proffered to the court that, in order to obtain an independent electricity connection from PREPA to their individual property, all the individual owners must agree to fund said project and request it to PREPA, and that, therefore, the possibility to obtain an exclusive meter for the property is currently unattainable. The Defendants argue that Plaintiff's actions prevent them to adequately maintain Villa 10 and keep the swimming pool in sanitary conditions. The adequate maintenance of the pool depends on a running pump, and, therefore, the compromise of Defendant, to avoid any further injunctive action from the Horned Dorset, depends on the availability of electrical service. The Defendants are at risk of being required to maintain the swimming pool, in order to prevent health risks to the hotel visitors and employees, as previously requested by the Horned Dorset. As there is no other

attainable way to obtain electricity services, the court concludes no other legal remedy is available to guarantee the sanitary condition of the swimming pool and guarantee that the pool will not represent a risk to the hotel's visitors and employees.

The Plaintiff suggested during the hearing held on December 12, 2017, that the Defendants could solve the situation by completely emptying and covering the swimming pool in their property. The Plaintiff's suggestion leads the court to consider the Defendants next assertion, namely, that the Plaintiff's actions disrupt the enjoyment of their property. Without the utility services, the Defendants are impeded to use Villa 10 for personal enjoyment. Suggesting that the Defendants could empty the pool to avoid injunctive action from the Plaintiff, the Horned Dorset shows disregard to the Defendants' rights and interests toward the property. Plaintiff proposes the abandonment of the Defendants' property, as a permanent solution for the swimming pool issue. Under these circumstances, the court recognizes that the disruption of the enjoyment of their private property constitutes a severe harm to the Defendants. Plaintiff's proposition leave the Defendants with no alternative other than to relinquish any right to use or enjoy their property, if they do not "willingly" submit the property to the Horned Dorset room's pool. Such result is nonsensical and such a limitation to the use of private property constitutes irreparable harm. The permanent interruption of the enjoyment of private property, even a second home, constitutes sufficient harm to warrant the injunctive relief granted through the Order issued on August 7, 2017. Absent any other remedy in law, the court finds that the Defendants have shown a potential of irreparable harm that cannot be compensable through any other available remedy.

The Defendants finally allege that they made an investment in equipment for the property, which require electric power to function, and that, absent electricity, the equipment will deteriorate. The Defendants submitted, as exhibits, evidence of the purchases made in order to repair the breaker box and the purchase of the pool pump and timer. The court finds that it need not address this matter for the purpose of the injunctive remedy, considering that the first two prongs of the injunctive relieve were met.

*The Balance of Hardships and the Effect of the Court's Ruling in the Public Interest*

Lastly, the court must determine if the potential of irreparable injury inflicted to Defendants, absent injunctive relief, outweighs any harm that the relief could cause to the Plaintiff. As proffered in open court during the hearing held on December 12, 2017, the parties identified a method that allows to measure the consumption of electricity in the Defendants' property and, hence, warrant Defendants' right to enjoy the property and to continue to provide maintenance to the pool, while concurrently safeguarding Plaintiff's right to be reimbursed for the utility consumption of the property. The injunctive relief's pecuniary effect on the Plaintiff is measurable and safeguarded by the court's *Order*, by conceding that the Plaintiff may move the court to disconnect the utility services if the Defendants do not pay for the measured electric power consumed. In relation to the water service, the parties proffered that they are unable to determine the water consumption of the property, considering the way the Complex was constructed. However, Plaintiff's pecuniary interests may be safeguarded by means of a security. Considering that any harm that can be inflicted to Plaintiff through the injunctive relief can be protected, the court weights in favor of Defendants, in the balance of harms that could be caused to the parties.

Further, the court finds that the determination to grant injunctive relief has no effect to the public interest.

*Requirement of Bond Pursuant to Fed. R. Civ. P. 65(c)*

Fed. R. Civ. Proc. 65(c), made applicable to bankruptcy pursuant to Fed. R. Bank. P. 7065, states that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[10] "Since a preliminary injunction may be granted on a mere probability of success on the merits, generally

---

[10] Fed. R. Bank P. 7065 states that "Rule 65 Fed. R. Civ. P. applies in adversary proceedings except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)."

the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction [was] issued wrongfully. The bond, in effect, is the moving's party's warranty that the law will uphold the issuance of the injunction". Global NAPs, Inc. v. Verizon New Eng., Inc., 489 F.3d 13, 21 (1st Cir. 2007)) citing Edgar v. MITE Corp. 457 U.S. 624, 649 (Stevens, J., concurring in part and concurring in the judgment). "By providing that the bond should be "in an amount that the court considers proper", Fed. R. Civ. P. 65(c), the Federal Rules of Civil Procedure vest the district court with "wide discretion"". Axia Med Media Corp. v. Mass. Tech. Park Corp., 2018 U.S. App. LEXIS 10434 (1st Cir. 2018). The court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant. Crowley v. Local No. 82, Furniture & Piano, 679 F.2d 978 (1st Cir. 1982), *rev'd on other grounds*. The Court of Appeals for the First Circuit has suggested that "Rule 65(c) is phrased in mandatory terms and the conclusion seems inescapable that once the court decides to grant equitable relief under Rule 65, it must require security from the applicant…" Sanchez, 572 F.3d at 22, fn. 16, citing 11A Wright, Miller, & Kane, Federal Practice & Procedure, §2954 (2d ed. 2009).

The electricity consumption of Villa 10 is measurable through the meter installed on the breaker box and, consequently, the Defendants are able to pay the Plaintiff monthly for the electric power consumed on their property. The court finds that such apportionment secures the Plaintiff from any harm that the injunctive relief granted by the court may cause.

However, the parties agree that, due to the design of the Complex, they are unable to determine the amount of consumption for the water service in each specific villa. Having determined that the injunctive relief standards were met by the Defendants, the court concludes that a bond must be posted by the Defendants, pursuant to Fed. R. Civ. P. 65 (c), in such an amount that secures Plaintiff from any damage that the relief may cause. Therefore, the court modifies the Order entered on August 7, 2017, and grants Plaintiff's request for security. The Defendants are required to post a bond of $3,000.00.

*Conclusion*

For the reasons stated herein, the court concludes that the Defendants met the four prong test that warrants injunctive relief, and therefore, Plaintiff's request to vacate the Order entered on August 7, 2017, is denied. However, the court modifies the Order, granting the Horned Dorset's request for security, pursuant to Fed. R. Civ. P. 65 (c), in the amount of $3,000.00, which the Defendants must provide within the next twenty-one (21) days. Furthermore, the Defendants are required to reimburse the Plaintiff monthly for the consumption of electricity services, as measured by the meter installed in the breaker box of their property. Failure to comply will prompt the dissolution of the relief.

SO ORDERED.

In San Juan, Puerto Rico, this 18th day of September, 2018.

*Enrique S. Lamoutte*
Enrique S. Lamoutte
United States Bankruptcy Judge

-24-